## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

### CHARLESTON DIVISION

BORDEAUX CAPITAL INC.,

        Plaintiff,

v.                          CIVIL ACTION NO.   2:18-cv-01262

UNITED STATES METHANOL CORPORATION, et al.,

        Defendants.

### MEMORANDUM OPINION AND ORDER

Before the Court is Defendant United States Methanol, LLC's ("USM LLC") Motion for Summary Judgment.  (ECF No. 78.)  For the reasons discussed more fully herein, the Motion, (ECF No. 78), is **DENIED**.

### I.    BACKGROUND

This action arises from a letter agreement between Plaintiff Bordeaux Capital, Inc. ("BCI") and Defendant United States Methanol Corporation ("USM Corp.").   USM Corp. was incorporated on December 18, 2014, (ECF No. 79 at 11; ECF No. 89 at 2), with the "basic business plan [] to acquire out-of-use methanol plants in other parts of the world, relocate them to West Virginia, and produce and market methanol to customers in the United States."  (ECF No. 79 at 11–12; ECF No. 89 at 2.)   At all relevant times, USM Corp.'s principals and majority shareholders were Bradley Gunn and Richard Wolfli.  (ECF No. 79 at 12; ECF No. 89 at 2.)

On September 28, 2015, USM Corp. obtained financing from KKCG Structured Finance Limited ("KKCG") to purchase shares in Slovenian companies that collectively owned a methanol manufacturing plant.   (ECF No. 78-3.)   Pursuant to a term sheet dated January 3, 2016 ("the Term Sheet"), USM Corp. and KKCG also negotiated the formation of a special-purpose entity, NewCo, to "finance, construct, own and operate the development and construction of two methanol processing facilities located in West Virginia (the 'Project'")."   (ECF No. 78-5 at 2.)   Under the Term Sheet, KKCG would make an equity investment of approximately $85,000,000 to finance the initial phase of constructing the two methanol plants.   (*Id.*)   In addition, USM Corp. was entitled to receive a development fee and reimbursement for its expenses incurred in developing the business plan.   (*Id.* at 6.)

Meanwhile, in November 2015, USM Corp. retained BCI to perform financial advisory services.   (ECF No. 79 at 13; ECF No. 89 at 2.)   USM Corp. and BCI executed a letter agreement on January 13, 2016 (the "Engagement Letter"), wherein BCI agreed to raise financing for the Project in exchange for a percentage of financing received by USM Corp.   (ECF No. 78-2.)

Thereafter, on January 29, 2016, KKCG and USM Corp. amended their original loan agreement by, among other things, increasing the loan amount by €5,371,943.   (ECF No. 78-4.) KKCG and USM Corp. then executed the Term Sheet on February 5, 2016.   (ECF No. 89-2 at 21–28.)   As a result, USM LLC was formed on March 7, 2016, as the "NewCo" entity referenced in the Term Sheet.

On March 10, 2016, USM LLC and KKCG entered into a Limited Liability Agreement governing USM LLC (the "USM LLC Agreement").   (ECF No. 78-7.)   The USM LLC Agreement created three classes of membership or ownership units in the company: Class A Units;

2

Class B Units; and Incentive Units.   (*Id.* at 13.)   On the same day, KKCG made an initial capital contribution to USM LLC in the amount of $750,000 and a $85,000,000 capital commitment to USM LLC.   In exchange, KKCG received 7,500 Class A Membership Units in USM LLC, which represented 100% of the Class A Membership Units.   Mr. Gunn and Mr. Woifli each received Incentive Units in USM LLC.   Class B Membership Units in USM LLC were not and never have been issued.   (*Id.* at 51.)

Pursuant to the USM LLC Agreement, USM LLC is managed by a Board of Managers (the "Board").   (*Id.* at 27.)   The Board is composed of five individuals, three of whom are designated by the Class A Members, and two of whom are designated by the Class B Members.   (*Id.* at 29.) If there are no Class B Members, as was the case here, the final two managers are designated by the Incentive Members.   (*Id.*)   On March 10, 2016, KKCG, as the sole Class A Member of USM LLC, designated Karel Komarek, Katarina Kohlmayer, and Natalie Miller[1] to the Board of USM LLC.   In addition, Mr. Gunn and Mr. Wolfli, as Incentive members, designated themselves to the Board.   (*Id.* at 52.)

On March 11, 2016, BCI invoiced USM Corp. for $677,521.66 for its services performed under the Engagement Letter.   (ECF No. 79 at 21; ECF No. 89 at 3.)   USM Corp. made partial payments on the invoice in the amount of $77,521.66 on May 24, 2016, and $50,000 on July 8, 2016.   (ECF No. 79 at 22; ECF No. 89 at 7.)   A total balance of $550,000 currently remains outstanding.   BCI alleges that USM LLC promised to pay the remaining balance and, thus, BCI continued to perform services for USM LLC until the Engagement Letter was terminated on

---

[1] Ms. Miller is identified in the USM LLC Agreement as "Natalie Alderson" but is currently known as Natalie Miller.   (ECF No. 89-6 at 6.)   Thus, the Court will refer to her as Ms. Miller herein.

3

September 6, 2017.  (ECF No. 1 at ¶ 41 (Compl.).)   When BCI inquired into the outstanding balance, USM LLC instructed BCI "that [its] only recourse was against USM Corp.   (*Id.* at ¶ 9.)

On August 28, 2018, BSI brought this action against USM Corp., USM LLC, and Petrochemical Holdings Corporation ("PHC")[2] (collectively, "Defendants").   BCI contends that "USM Corp. and USM LLC secretly and intentionally conspired to, and did, arrange their affairs so that all or substantially all of USM Corp.'s assets, including its intellectual property, business plan, bids, rights, employees, prospects and opportunities, including the Project, were transferred from USM Corp. (or PHC) to USM LLC (the 'Secret Agreement') for less than fair value, with the intention of leaving USM Corp. (now PHC) a shell company."   (*Id.* at ¶ 24.)   Based on these allegations, BCI asserts five causes of action against the Defendants for breach of contract, unjust enrichment, quantum meruit, intentional tort/fraud, and violations of the West Virginia Uniform Voidable Transactions Act, W. Va. Code § 40-1A-1, *et. seq.* ("WVUVTA"), (*id.* at ¶¶ 43–62), for which it seeks compensatory and punitive damages, pre- and post-judgment interest, attorney fees and costs, and any other relief justified, (*id.* at 15).

USM LLC filed the present motion for summary judgment on December 20, 2019.   (ECF No. 78.)   BCI timely responded on January 13, 2020, (ECF No. 89), and USM LLC filed a timely reply on January 20, 2020,[3] (ECF No. 91).   BCI also filed a motion to file a sur-reply on February 7, 2020 and attached its proposed sur-reply as an exhibit thereto.[4]   (ECF No. 96.)   As such, the motion is ripe for adjudication.

---

[2] USM Corp. changed its name to Petrochemical Holdings Corporation ("PHC") in August 2017.   (ECF No. 78-18 at 28–29.)   As most of USM Corp.'s activities in connection with this case occurred before the alleged name change, the Court will refer to this entity as USM Corp. throughout this memorandum opinion and order.
[3] The Court previously granted a joint motion by the parties to extend the briefing deadlines associated with the pending motion.   (*See* ECF No. 90.)   In accordance with that order, the response and reply are timely and in compliance with Local Rule of Civil Procedure 7.1(a)(7).
[4] The Court **GRANTS** BCI's motion to file a sur-reply, (ECF No. 96), because the information contained therein is

4

## II.    LEGAL STANDARD

Summary judgment is appropriate when the moving party "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A fact is material when it 'might affect the outcome of the suit under the governing law.'" *Strothers v. City of Laurel*, 895 F.3d 317, 326 (4th Cir. 2018) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). "A genuine dispute arises when 'the evidence is such that a reasonable jury could return a verdict for the non-moving party.'" *Id.* (quoting *Anderson*, 477 U.S. at 248). "Thus, at the summary judgment phase, the pertinent inquiry is whether there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Variety Stores, Inc. v. Wal-Mart Stores, Inc.*, 888 F.3d 651, 659 (4th Cir. 2018) (alteration and internal quotation marks omitted).

"The burden is on the nonmoving party to show that there is a genuine issue of material fact for trial . . . by offering 'sufficient proof in the form of admissible evidence' . . . ." *Guessous v. Fairview Prop. Invs., LLC*, 828 F.3d 208, 216 (4th Cir. 2016). In ruling on a motion for summary judgment, this Court "view[s] the facts and all justifiable inferences arising therefrom in the light most favorable to the nonmoving party." *Jones v. Chandrasuwan*, 820 F.3d 685, 691 (4th Cir. 2016) (quoting *Libertarian Party of Va. v. Judd*, 718 F.3d 308, 312 (4th Cir. 2013)).

## III.    DISCUSSION

### A.  Breach of Contract

In Count One of the Complaint, BCI alleges that Defendants breached the Engagement Letter by failing to pay all fees owed to BCI for its services performed under the agreement. (ECF

---

pertinent to rebut arguments USM LLC raised for the first time in its response brief.

No. 1 at ¶ 46.)   Pursuant to the Engagement Letter, BCI is entitled to "Work Fees," "US Methanol-Sourced Funding Fees," and "BCI-Sourced Funding Fees" under the following conditions:

a.  Work fees . . . [for a total of $30,000] shall be payable to BCI for acting as the Advisor to [USM Corp.] for a minimum term of three months [between November 2015 and February 2016.]

b.  If, during the term of this agreement or within the period of 12 months following termination of this agreement, [5] any [6] US Methanol-Sourced Funding is completed, or [USM Corp.] announce[s] or enter[s] into an agreement in respect of any US Methanol-Sourced Funding which is subsequently completed, [USM Corp.] will pay [BCI] a ["US Methanol-Sourced Funding"] fee . . . of 0.75% . . . of the gross proceeds arising therefrom, payable on closing of the US Methanol-Sourced Funding.   The US Methanol-Sourced Funding Fee shall be payable to BCI on the first closing of the US Methanol-Sourced Funding, based on the gross proceeds committed by the US Methanol-Sourced Investor(s), regardless of whether the gross proceeds are disbursed to [USM Corp.] in one or more tranches or on one or more dates.

c.  If, during the term of this agreement or within the period of 12 months following termination of this agreement, any BCI-Sourced Funding [7] is completed in connection with one or both of [USM Corp.'s] methanol projects, or [USM Corp.] announce[s] or enter[s] into an agreement in respect of, any BCI-Sourced Funding which is subsequently completed, [USM Corp.] will pay [BCI] a ["BCI-Sourced Funding Fee"] . . . equal to:

i.  Where the BCI-Sourced Funding is in the form of an equity investment (including common shares, preferred shares, units, or such similar equity securities), 3.0% . . . of the gross proceeds arising therefrom, paying on closing of the BCI-Sourced Funding; and

ii.  Where the BCI-Sourced Funding is in the form of a debt investment (including senior debt, mezzanine debt, convertible bonds, or such similar debt securities), 1.5% . . . of the gross proceeds arising therefrom, paying on closing of the BCI-Sourced Funding.

---

[5] It is uncontested that the Engagement Letter was terminated on September 6, 2017.
[6] "US Methanol-Sourced Funding" means "US Methanol-sourced investor(s)" identified in Schedule B of the Engagement Letter, including KKCG.   (ECF No. 78-2 at 2, 9.)
[7] "BCI-Sourced Funding" includes "investor(s) contacted by BCI" set forth in Schedule C of the Engagement Letter "or as mutually agreed to and amended by BCI and [USM Corp.] from time to time."   (*Id.*)

(ECF No. 78-2 at 3.)   In addition, BCI is entitled to reimbursement for "out-of-pocket expenses." (*Id.* at 4.)   On March 11, 2016, BCI sent USM Corp. an invoice totaling $677,521.66 for its performance under the Engagement Letter.   The invoice comprised of (1) a $30,000 work fee; (2) a $637,500 advisory fee equal to 0.75% of KKCG's $85 million commitment to USM LLC; and (3) $10,021.66 for out-of-pocket expenses.   (ECF No. 89-2 at 5.)   USM Corp. paid BCI $121,521.66, leaving a total balance of $550,000 outstanding on the invoice.

USM LLC contests this outstanding amount, arguing that any USM Corp.-Sourced Funding Fee or BCI-Sourced Funding Fee "must be paid into USM Corp. to trigger any fee obligation."   (ECF No. 79 at 25.)   In support of this argument, USM LLC cites a portion of the language contained in Article II.b of the Engagement Letter, which states that any "US Methanol-Sourced Funding Fee shall be payable to BCI . . . based on the gross proceeds committed by the US Methanol-Sourced Investor(s), regardless of whether the gross proceeds *are disbursed to [USM Corp.]* in one or more tranches or on one or more dates."   (ECF No. 78-2 at 3 (emphasis added).) USM LLC contends that the only funding USM Corp. received under this provision of the Engagement Letter was the €5,371,943 loan from KKCG on January 29, 2016, which allowed USM Corp. to purchase the Slovenian shares.   Thus, it claims that the loan payment entitled BCI to 0.75% of €5,371,943, or $43,513 in U.S. currency, plus the $30,000 work fee for a total of $74,319.[8]   (ECF No. 79 at 26.)

BCI does not dispute USM LLC's contention that this provision of the Engagement Letter limits US Methanol-Sourced and BCI-Sourced Funding Fees to funding paid directly into USM Corp.   Rather, BCI argues two reasons that these advisory fees also apply to funding obtained by

---

[8] USM LLC's calculation excludes the out-of-pocket expenses.   Thus, USM LLC also appears to contest this charge noted in BCI's invoice for $10,021.66.

USM LLC.   First, BCI contends that funding paid to USM LCC triggers a fee obligation because the Engagement Letter is binding on USM Corp.'s successors.   (ECF No. 89 at 6.)   BCI points to Section XII of the Engagement Letter, which states that the "agreement will inure to the benefit of and be binding upon the parties hereto and their respective successors", (ECF No. 78-2 at 5), and goes on to argue that USM LLC is a successor of USM Corp.

Under the plain meaning of this provision, a successor of USM Corp. might be liable to pay fees and expenses owed to BCI for its advisory services that result in funding being paid into USM Corp.   (*Id.* at 3–4.)   However, this unambiguous language cannot be read to modify the terms of Article II.b, which provides that US Methanol-Sourced Funding Fees apply only to funding paid to USM Corp.   There is no language in the Engagement Letter that expressly provides that BCI is entitled to advisory fees for funding obtained by USM Corp.'s successors or USM LLC.   As such, the Court will not read such term into the agreement or create new obligations under the Engagement Letter that do not exist on its face.[9]

Second, BCI argues that the parties modified the Engagement Letter through their course of conduct, namely, by making and accepting partial payments on the invoice and thereby waiving the alleged requirement that US Methanol-Sourced Funding be committed to USM Corp.   (ECF No. 89 at 8–9.)   The Engagement Letter provides, in relevant part, that "[t]his agreement shall be governed by and construed in accordance with the laws of the Province of Ontario."   (ECF No. 78-2 at 5.)   The parties agree that the Engagement Letter's choice of law provision should be upheld.

---

[9] USM LLC also refers the Court to Mr. Gunn's interpretation of this provision as only applying to financing provided to USM Corp.   (ECF No. 79 at 25.)   However, the Court discerns no ambiguity requiring resort to the consideration of extrinsic evidence.

In determining whether to enforce a contractual choice of law provision or apply some other law, the Court must apply the choice of law rules of West Virginia, the state in which this Court sits.   *See Albemarle Corp. v. AstraZeneca UK Ltd.*, 628 F.3d 643, 652–53 (4th Cir. 2010) (citing *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487 (1941).   Regarding choice of law provisions, the West Virginia Supreme Court of Appeals has held that "[a] choice of law provision in a contract will not be given effect when the contract bears no substantial relationship with the jurisdiction whose laws the parties have chosen to govern the agreement, or when the application of that law would offend the public policy of this state.   Syl. Pt. 1, *Gen. Elec. Co. v. Keyser*, 275 S.E.2d 289, 290 (W. Va. 1981).   Here, BCI is incorporated in Ontario and provided its consulting services from its Ontario office.   (ECF No. 1 ¶ 1.)   In addition, USM Corp. was required to pay BCI's fees to BCI in Ontario.   The Court finds that the Engagement Letter bears a substantial relationship with Ontario and the application of Ontario law would not offend the public policy of West Virginia.   Therefore, the Court will enforce the contractual choice of law provision and apply Ontario law to BCI's breach of contract claim.

Under Canadian law, "[w]aiver will be found only where the evidence demonstrates that the party waiving had (1) a full knowledge of rights; and (2) an unequivocal and conscious intention to abandon them."   *Saskatchewan River Bungalows Ltd. v. Maritime Life Assurance Co.*, [1994] 2 S.C.R. 490 (Can.).   An intention to relinquish a contractual right "may be expressed in a formal legal document, . . . in some informal fashion or it may be inferred from conduct."   *Id.* (citing *Fed. Bus. Dev. Bank v. Steinbock Dev. Corp.*, (1983) 42 A.R. 231 (Can. Alta. C.A.)).

USM LLC agrees that Ontario law applies to the contract but maintains an opposing view as to whether the terms of the Engagement Letter can be modified through course of conduct.

USM LLC cites Article XII of the Engagement Letter, which provides that "[n]o waiver, amendment or other modification . . . shall be effective unless in writing and signed by each party thereto . . . ."   USM LLC avers that BCI's alleged waiver is ineffective because there is no writing to that effect.   (ECF No. 91 at 5.)   However, courts in Ontario have frequently held that parties may modify the terms of a contract through their course of conduct "even in the face of a clause requiring changes to the agreement to be in writing."   *Shelanu Inc. v. Print Three Franchising Corp.*, 2003 CarswellOnt 2038 (Can. Ont. C.A.) (WL) (holding that "[w]here the parties have, by their subsequent course of conduct, amended the written agreement so that it no longer represents the intention of the parties, the court will refuse to enforce the written agreement.); *Colautti Constr. Ltd. v. Ottawa (City)*, 1984 CarswellOnt 731 (Can. Ont. C.A.) (WL) (finding that a party could not rely on the strict provisions of the contract to avoid liability where "the parties, by their conduct, . . . varied the terms of the contract which require[d] extra costs to be authorized in writing.").

As evidence of USM Corp.'s conscious intent to compensate BCI for its work associated with KKCG's investment in USM LLC, BCI first offers correspondence from Ms. Kohlmayer, a principal director of KKCG, (ECF No. 89-4 at 3), wherein she states that KKCG obtained, with BCI's assistance, a bank financing term sheet that was necessary to close on the investment in USM LLC.   (ECF No. 89-3 at 36, 77.)   Due to its services, BCI included in its invoice to USM Corp. an advisory fee equal to 0.75% of KKCG's $18 million investment or $637,500.   (*Id.* at 5.) BCI notes, and USM LLC does not dispute, that Mr. Gunn, CEO of both USM Corp. and USM LLC, issued two payments totaling $127,521.66 to BCI in response to the $677,521.66 invoice, which included $637,500 for the US Methanol-Source Funding Fee.

BCI also has submitted communications between Gage Jull of BCI and Mr. Gunn, memorializing an apparent verbal agreement between Mr. Jull and Mr. Gunn about a payment schedule for the remaining debt.   (ECF No. 89-2 at 2, 6.)   In the first email, dated May 25, 2016, Mr. Jull asks Mr. Gunn to affirm "that the balance of [BCI's] account receivable will be paid in three amounts as follows:" (1) $300,000 to be paid around June 26, 2016; (2) $150,000 to be paid around July 26, 2016; and (3) $150,000 to be paid around August 26, 2016.   (*Id.* at 6.)   In his second email, dated August 4, 2016, Mr. Jull states, "[Mr. Gunn] agreed to wire transfer US$250k or thereabouts on Friday July 29th as partial payment of the amount outstanding."   (*Id.* at 2.)   BCI notes the absence of any communication from USM Corp. or USM LLC denying the amount BCI invoiced.   In addition, BCI argues that, had only $74,319 been owed to BCI for its services, there is no explanation for why USM Corp. paid $53,202.66 over what USM LLC claims BCI was entitled to under the agreement.

This evidence, viewed in the light most favorable to BCI, presents an issue of material fact concerning the parties' conscious intent to waive or modify the terms of the Engagement Letter. A reasonable jury could find, as evidenced by the partial payments made separately on May 24, 2016, and July 8, 2016, that USM Corp. modified the terms of the Engagement Letter such that funding paid to USM LLC in addition to USM Corp. triggers a fee obligation.   Accordingly, USM LLC's motion for summary judgment on BCI's breach of contract claim is **DENIED**.

B. *Successor Liability*

Relatedly, USM LLC argues that BCI's successor liability claim for breach of contract against USM LLC must be dismissed.   BCI alleges in Count One of the Complaint that USM LLC is a successor to USM Corp. because it impliedly assumed the liabilities of USM Corp. and

operates as a mere continuation of USM Corp.   (ECF No. 1 at ¶¶ 44–45.)   Under West Virginia's choice of law rules, successor liability is generally "analyzed under the law of the transferee corporation's state of incorporation."   *Carter Enter., Inc. v. Ashland Specialty Co.*, 257 B.R. 797, 801–02 (S.D. W. Va. 2001).   Here, the alleged transferee, USM LLC, is a Delaware company. (*Id.* ¶ 3.)   Therefore, the Court will apply Delaware law to BCI's successor liability claim.

In Delaware, generally when one company sells or otherwise transfers all of its assets to another, the purchaser does not become responsible for the debts and liabilities, including claims for tortuous conduct, of the seller.   *See Magnolia's at Bethany, LLC v. Artesian Consulting Engineers, Inc.*, No. S11 C–04–013, 2011 WL 4826106, at *2 (Del. Super. Ct. Sept. 19, 2011). However, there are four limited exceptions where liability may transfer to the seller: (1) the purchaser assumes such liability; (2) the transaction amounts to a *de facto* merger or consolidation; (3) the purchaser is a mere continuation of the predecessor under a different name;[10] or (4) the transaction was fraudulent.   *Id.*; *Ross v. Desa Holdings Corp.*, No. 05C-05-013 MMJ, 2008 WL 4899226, at *4 (Del. Super. Ct. Sept. 30, 2008).   In this case, BCI asserts successor liability under the assumed liability, mere continuation, and fraud exceptions.

---

[10] USM LLC cites *Lopez v. Delta Int'l Mach. Corp.*, 312 F. Supp. 3d 1115, 1162 (D.N.M. 2018), for the proposition that the Delaware Superior Court has not adopted the mere continuation theory of successor liability.   In discussing successor liability, the *Lopez* court found that while "some Delaware lower courts recognize a version of the mere-continuation theory", the Delaware Superior Court has only adopted the *de facto* merger exception of successor liability.   *Id.*   However, in *Elmer v. v. Tenneco Resins, Inc.*, 698 F. Supp. 535, 540 (D. Del. 1988), the District Court of Delaware, when applying Delaware state law, adopted the four traditional exceptions, including the mere continuation exception.   *Elmer* has been cited with approval in decisions by the Delaware Superior Court, *see Ross v. Desa Holdings Corp.*, No. 05C-05-013, 2008 WL 4899226, at *4 n.6 (Del. Super. Ct. Sep. 30, 2008); *In re Asbestos Litig. v. Haveg Indust., Inc.*, No. 92C-10-100, 1994 WL 89643, at *3 (Del. Super. Ct. Feb. 4, 1994), and the Delaware Superior Court has similarly discussed and applied the mere continuation exception in numerous decisions.   *See, e.g., Magnolia's at Bethany, LLC v. Artesian Consulting Engineers, Inc.*, No. S11 C–04–013, 2011 WL 4826106, at *2 (Del. Super. Ct. Sept. 19, 2011).   Therefore, the Court is not persuaded by this nonbinding authority cited by USM LLC.

1.   <u>Assumed Liability</u>

First, BCI argues that USM LLC expressly or impliedly agreed to assume USM Corp.'s obligation to make payment on the fees owed to BCI under the Engagement Letter.   BCI points to the emails from Mr. Jull to Mr. Gunn, wherein Mr. Jull outlines an apparent agreement for payments on BCI's outstanding invoice.   *See supra* at 11.   In addition, BCI references its own interrogatory response, which states that BCI continued to work for USM LLC in reliance on Mr. Gunn's numerous promises to pay BCI for its services performed under the Engagement Letter. (ECF No. 89-7.)   BCI concludes that this evidence demonstrates an expression of Mr. Gunn's intent, on behalf of USM LLC, to assume USM Corp.'s liability to BCI.

Despite BCI's assertion, these correspondences are not conclusive evidence of an express or implied agreement on the part of USM LLC to assume any of USM Corp.'s liabilities to BCI. At the time these correspondences were sent, Mr. Gunn was CEO of both USM LLC and USM Corp.   The emails contain nothing to suggest Mr. Gunn made a promise to compensate BCI on behalf of USM LLC or that he made such promises while acting in his capacity as CEO of USM LLC as opposed to USM Corp.   As such, this evidence presents an issue of fact to be resolved by the jury.   Accordingly, USM LLC's motion for summary judgment on BCI's successor liability claim under the assumed liability exception must be **DENIED**.

2.   <u>Mere Continuation</u>

BCI also argues that USM LLC assumed the liability of USM Corp. based on the "mere continuation" theory of successor liability.   Delaware narrowly construes the mere continuation exception such that it is only available "where the new entity is so dominated and controlled by the old company that separate existence must be disregarded."   *Magnolia's*, 2011 WL 4826106,

at *3 (citing *Elmer v. v. Tenneco Resins, Inc.*, 698 F. Supp. 535, 542 (D. Del. 1988)).   A party

relying on the mere continuation exception of successor liability must establish "the common

identity of the officers, directors, or stockholders of the predecessor and successor corporations,

and the existence of only one corporation at the completion of the transfer."   *Id.*   "The test is not

the continuation of the business operation, but rather the continuation of the corporate entity."

*Elmer*, 698 F. Supp. at 542 (citing *Fountain v. Colonial Chevrolet Co.*, 1988 WL 40019, at *7

(Del. Super. Ct. April 13, 1988).

With respect to the common identify of officer, directors, or shareholders, there is no

dispute that USM Corp. and USM LLC shared the same CEO, Mr. Gunn, and the same COO, Mr.

Wolfli.   Mr. Gunn and Mr. Wolfli both had equity interest in USM LLC as incentive members

and were also the majority shareholders of USM Corp., owning 86% interest combined.

However, KKCG, which holds a controlling interest in USM LLC as Class A members, held no

ownership interest in USM Corp.

Nonetheless, BCI argues that KKCG had apparent control over USM Corp. by virtue of

the loan extended to USM Corp. to acquire the Slovenian shares.   In support of this assertion, BCI

claims that the loan agreement provided that upon default, "KKCG would obtain [Mr. Gunn] and

[Mr. Wolfli's] controlling interest – approximately 86% – in [USM Corp.]"   (ECF No. 89 at 13.)

BCI also cites to an email in which Ms. Miller, of KKCG, stated the following:

> Currently, the methanol plant in Slovenia is owed by US Methanol Corporation.
> The loan with US Methanol Corporation gives KKCG effective control / ownership
> of the company.   We are working to transfer the Slovene assets from US Methanol
> Corp to US Methanol LLC.   Once this is completed then we would be comfortable
> having the US Methanol Loan repaid.

14

(ECF No. 89-3 at 70.)   However, as USM LLC points out, KKCG never called a default on the loan, and there is no evidence that shows KKCG ever actually obtained these shares.   Further, Ms. Miller's lay opinion regarding the effect of the loan agreement offers no value here.

Additionally, it cannot be said that USM Corp. and USM LLC were the "same legal person."   *Fountain*, 1988 WL 40019, at *9 (citation omitted).   Mr. Gunn testified that USM Corp. continued to exist in March 2016, when USM LLC was formed.   (ECF No. 78-18 at 5.)   USM Corp. maintained a checking account at Chase Bank into 2017 from which it paid BCI $77,521 on May 24, 2016, and $50,000 on July 8, 2016.   Further, Mr. Gunn's August 2017 separation agreement with USM LLC establishes that USM Corp. remained in existence well into 2017. (ECF No. 78-9 at 7).   Indeed, that agreement required Mr. Gunn to change the name of USM Corp. to prevent any false association with USM LLC.   (*Id.*; s*ee also* ECF No. 78-18 at 10–11.) As a result, USM Corp. changed its name to Petrochemical Holdings Corporation in August 2017, (ECF No. 78-18 at 11, 28–29), and on September 25, 2017, sold its shares in the Slovenian companies to Liberty Two Methanol, LLC ("Liberty Two") for €6,469,487.98, (ECF No. 78-10). Under these facts, the Court cannot find that USM Corp. is a continuation of USM LLC. Accordingly, USM LLC's motion for summary judgment is **GRANTED** insofar as BCI claims successor liability under the mere continuation exception.

3.  Fraud

Finally, BCI claims that the fraud exception to successor liability applies.   BCI contends that the asserted violations of the Uniform Voidable Transfer Act are deemed fraud under Delaware law and successor liability principles.   As USM LLC also moves for summary judgment on BCI's claim under the WVUVTA, the Court will address these issues together.

In Count Five of the Complaint, BCI alleges that USM Corp. fraudulently transferred its assets to USM LLC in attempt to avoid making payment to BCI under the Engagement Letter and in violation of the WVUVTA.   (ECF No. 1 at 12–14.)   Pursuant to W. Va. Code § 40-1A-13(b), "[a] claim for relief [under the WVUVTA] is governed by the local law of the jurisdiction in which the debtor is located when the transfer is made or the obligation is incurred."   While this choice of law provision was enacted on June 8, 2018, after the alleged fraudulent transaction occurred here, it applies retroactively because the "statutory changes [] are purely procedural in nature." *Martinez v. Asplundh Tree Expert Co.*, 803 S.E.2d 582, 586–84 (W. Va. 2017) (alterations and internal citation omitted).   In this case, USM Corp. was located in California when the transfer of assets was allegedly made on March 10, 2016.   (ECF No. 1 ¶ 2.)   Therefore, California law applies to BCI's fraudulent transfer claim.   *See* W. Va. Code § 40-1A-13(a).

Under California law, a transaction is fraudulent and voidable if it is "undertaken with the intent to prevent a creditor from reaching that interest to satisfy its claim."   *Potter v. All. United Ins. Co.*, 37 Cal. App. 5th 894, 903–04, 250 Cal. Rptr. 3d 282, 289 (Ct. App. 2019) (citation omitted).   Pursuant to California's Uniform Voidable Transaction Act ("CUVTA") a plaintiff creditor can pursue an action for actual fraud or constructive fraud.   *See* Cal. Civ. Code § 3439.04; *Donell v. Kowell*, 533 F.3d 762, 770 (9th Cir. 2008) ("There are two theories under which a [creditor] may proceed under [section 3439.04]: actual fraud or constructive fraud.").   Actual fraud requires a plaintiff to show "actual intent to hinder, delay, or defraud any creditor of the debtor."   Cal. Civ. Code § 3439.04(a)(1).   Constructive fraud requires a plaintiff to "show[ ] that the debtor transferred property or incurred an obligation 'without receiving equivalent value in exchange' and . . . the debtor 'intended to incur, or believed or reasonably should have believed

that the debtor would incur, debts beyond the debtor's ability to pay as they became due." *Sanger v. Ahn*, 2019 WL 174976, at *7 (N.D. Cal. Jan. 11, 2019) (quoting cal. Civ. Code § 3439.04(a)(2)).

USM LLC avers that it is entitled to summary judgment on BCI's claim under both actual and constructive fraud theories because BCI has failed to establish two essential elements of the CUVTA.   First, with respect to actual fraud, USM LLC argues that there is no evidence that the alleged transfer was made with the actual intent to prevent BCI from collecting its fees under the Engagement Letter.

To assist in determining whether a transfer was made with "actual intent to hinder, delay, or defraud," the CUVTA identifies 11 nonexclusive factors that may be considered:

(1) Whether the transfer or obligation was to an insider.
(2) Whether the debtor retained possession or control of the property transferred after the transfer.
(3) Whether the transfer or obligation was disclosed or concealed.
(4) Whether before the transfer was made or obligation was incurred, the debtor had been sued or threatened with suit.
(5) Whether the transfer was of substantially all the debtor's assets.
(6) Whether the debtor absconded.
(7) Whether the debtor removed or concealed assets.
(8) Whether the value of the consideration received by the debtor was reasonably equivalent to the value of the asset transferred or the amount of the obligation incurred.
(9) Whether the debtor was insolvent or became insolvent shortly after the transfer was made or the obligation was incurred.
(10) Whether the transfer occurred shortly before or shortly after a substantial debt was incurred.
(11) Whether the debtor transferred the essential assets of the business to a lienor that transferred the assets to an insider of the debtor.

Cal. Civ. Code § 3439.04(b).

Here, BCI argues that the alleged transfer from USM Corp. to USM LLC was to an insider. The evidence establishes that USM Corp. and USM LLC shared the same CEO and COO.   In addition, these two individuals, Mr. Gunn and Mr. Wolfli, were the majority shareholders of USM

17

Corp. and had equity interest in USM LLC.   However, Mr. Gunn and Mr. Wolfli's incentive shares in USM LLC gave them no voting rights and, thus, no actual control over USM LLC. Further, while Mr. Gunn and Mr. Wolfli were both on the Board of USM LLC, they were only two of several members of USM LLC's Board.   No other USM LLC Board members were also directors of USM Corp.

The fifth badge of fraud considers whether USM Corp. transferred substantially all of its assets to USM LLC.   The primary assets allegedly transferred to USM LLC were USM Corp.'s business plan for the Project and the Slovenian shares.   There is no dispute that USM LLC was formed as a special-purpose entity to receive financing and pursue the Project.   As for the Slovenian shares, the undisputed evidence shows that USM Corp. did not transfer them to USM LLC but rather sold them for €6,469,487.98 to USM LLC's wholly owned subsidiary, Liberty Two.   (ECF No. 88-3 at 22.)   BCI has offered no further evidence regarding USM LLC's effective control over these assets or how they are held within the corporate structure.

As for the eighth badge of fraud, whether the value of the consideration received by USM Corp. was reasonably equivalent to the value of the assets transferred to USM LLC, BCI has presented evidence that, in exchange for the business plan that was transferred to USM LLC, USM Corp. only received partial compensation in the form a development fee.   USM Corp. provided an itemized list of costs incurred in developing a business plan for USM LLC, totaling $1,486,339. (ECF No. 89-15 at 3.)   The development fee was to be paid to USM Corp. in two installments; however, BCI contends USM Corp. has only received one payment for $750,000.   BCI also argues that USM Corp. received nothing in exchange for the Slovenian assets.   USM LLC does not challenge these assertions.

Finally, USM LLC does not contest that the alleged transfer of assets occurred essentially simultaneously or shortly after USM Corp. incurred the debt owed to BCI.   As both precipitated KKCG's $85 million investment in USM LLC, the tenth badge of fraud weighs in BCI's favor.

The parties have not discussed the remaining factors and the Court will not speculate as to their applicability.

In sum, BCI has presented some evidence to support its claim of actual fraud.   However, given the factual issues, the Court declines to make such a finding at the summary judgment stage. While "[t]here is no minimum number of factors that must be present before the scales tip in favor of finding [ ] actual intent to defraud," unanswered questions remain regarding USM Corp.'s intent when the transfers at issue were made.   *Filip v. Bucurenciu*, 129 Cal. App. 4th 825, 834 (2005) (recognizing badges of fraud are "meant to provide guidance to the trial court, not compel a finding one way or the other"); Cal. Civ. Code § 3439.04, cmt.5 (The presence of one or more badges of fraud is "merely evidence from which an inference of fraudulent intent may be drawn.").

USM LLC also contends that BCI cannot maintain either an actual or constructive fraud claim under the CUVTA because BCI has not established the value of the assets purportedly transferred.   Without doing so, USM LLC contends that BCI cannot establish that USM Corp. did not receive "reasonable equivalent value" for the assets allegedly transferred to USM LLC.   (ECF No. 91 at 14.)   Contrary to this assertion, BCI presented an itemized list of development fees USM Corp. incurred through February 25, 2016, totaling $1,486,339.   Clearly, USM Corp.'s expenses associated with the development of USM LLC far exceed the $750,000 development fee that was paid to USM Corp.   Given the value of USM Corp.'s development services is reasonably deducible from the evidence, the argument that BCI's claim is based on speculation has no merit.

19

Accordingly, the Court **DENIES** USM LLC's motion for summary judgment on both BCI's fraudulent transfer claim under the CUVTA and successor liability claim under the fraud exception.

### C. Unjust Enrichment

In Count Two, BCI claims that "USM Corp., PHC and USM LLC have been unjustly enriched as a result of the work performed by BCI pursuant the Engagement Letter . . . ."   (ECF No. 1 at ¶ 48.)   USM LLC argues that this claim must be dismissed because it is based entirely on work performed pursuant to an express contract, i.e. the Engagement Letter.   *See Bright v. QSP, Inc.*, 20 F.3d 1300, 1306 (4th Cir. 1994) (holding "an action for unjust enrichment is quasicontractual in nature [and] may not be brought in the face of an express contract." (internal quotation and citation omitted)); *Ash v. Allstate Ins. Co.*, 2013 WL 5676774 at *5 (W. Va. Oct. 18, 2013) (affirming dismissal of unjust enrichment claim based upon obligation that "could only arise pursuant to the terms of [the claimant's] insurance contract").   BCI does not disagree with USM LLC's representation of the law but argues that it can pursue an unjust enrichment claim in the alternative to a breach of contract claim since the terms of the express contract are in dispute.

BCI cites to *Span Construction & Engineering, Inc. v. Uwharrie Builders, LLC*, No. 3:18-cv-178, 2019 WL 1574233 (N.D. W. Va. Jan. 30, 2019) in support of this proposition.   In *Span*, a subcontractor claimed that it fulfilled all of its obligations under a subcontract but that the general contractor failed to make payment on the invoices.   *Id.* at *1.   As a result, the subcontractor asserted claims, among others, for breach of contract and unjust enrichment.   The court noted that "a plaintiff is permitted to plead unjust enrichment as an alternative to contract recovery when the terms of a contract or the parties to said contract are disputed."   *Id.* at *2 (internal quotation marks,

20

alterations and citations omitted).   Because the general contractor claimed that full payment due under the subcontract had been tendered to the subcontractor, the court found that "the terms of the contract" in addition to "whether payment ha[d] been tendered there under" were in dispute and, thus, permitted the plaintiff's unjust enrichment claim to proceed as an alternative theory to breach of contract.   *Id.* (emphasizing that plaintiff ultimately would not be able to recover under both theories).

Here, USM LLC claims that the existence of the Engagement Letter is not in dispute. Nonetheless, USM LLC adamantly contends throughout the present motion that it is not a party to the Engagement Letter or bound by its terms.   Additionally, as previously discussed, the question remains whether USM Corp. and BCI modified the terms relating to fee triggering events through their course of conduct.   *See supra* at 11.   Thus, it is apparent that, like in *Span*, "the terms of [the] contract [and] the parties to said contract are disputed."   *Id.*   Therefore, while BCI may not recover under both theories, it is not barred from pursing an unjust enrichment claim in the alternative to a breach of contract claim at this stage.   *See Noe v. City Nat'l Bank of W. Va.*, No. 3:19-cv-0690, 2020 WL 836871, at *6 (S.D. W. Va. Feb. 19, 2020).   As such, summary judgment on BCI's unjust enrichment claim is **DENIED**.

D.  *Quantum Meruit*

BCI also asserts a claim in Count Three for quantum meruit in the alternative to breach of contract.   BCI alleges that USM LLC "requested, encouraged, and acquiesced to BCI's provision of services, . . . and it would be unjust for [USM LLC] to . . . retain the benefit conferred by BCI . . . without compensating BCI for its services."   (ECF No. 1 at ¶ 50.)   Under West Virginia law, the theory of quantum meruit "is based on an implied contract," which "cannot arise, as against

21

one benefited by work performed, when such work was done under a special contract with other persons." *Rosenbaum v. Price Constr. Co.*, 184 S.E. 261, 263–64 (W. Va. 1936) (internal quotations and citation omitted).   In other words, like unjust enrichment, quantum meruit is unavailable where an express contract covering the same subject matter exists.   *See Fed. Sav. & Loan Ins. Corp. v. Quality Hotels and Resorts, Inc.*, 928 F.2d 399, at *4 (4th Cir. 1991).

BCI attempted to explain the basis for its quantum meruit claim and to quantify the amount it seeks to recover under this theory in its interrogatory responses to USM LLC.   Specifically, BCI states in an initial interrogatory response that "[i]f it is determined that there is no contractual agreement between USM LLC and [BCI], then . . . Plaintiff is entitled to the reasonable value of the work provided to USM LLC."   (ECF No. 78-16 at 4.)   In a supplemental response, BCI states, "[a]s set forth in the expert report of Rufus Miller & Associates, A.C., the benchmark for the reasonable value of the work provided to USM LLC is the contractual amount due and owing to Plaintiff, that is, $677,521.66."   (*Id.* at 11.)   USM LLC maintains that BCI's responses are insufficient to establish its claim for two reasons.   First, USM LLC argues that the Court should exclude BCI's supplemental discovery response because it was served after discovery closed. Second, USM LLC avers that BCI has failed to identify any services performed apart from those performed under the Engagement Letter and, thus, it may only pursue these alleged damages under a breach of contract theory.

With regard to USM LLC's first contention, BCI concedes that the supplemented discovery response was served after the discovery deadline set forth in the scheduling order.   Pursuant to the Court's Amended Scheduling Order, the discovery deadline was November 29, 2019.   (ECF No. 60.)   BCI's supplemented discovery response was served almost two weeks later, on

22

December 11, 2019.   (ECF No. 78-16 at 14.)   Nonetheless, BCI maintains that the Court should consider this response because USM LLC has demonstrated no prejudice as a result of the untimely response.   The Court agrees.   Given this supplemental discovery response was served almost six months ago and a trial date is not set, the Court finds that BCI's failure to timely supplement the response was harmless.   *See* Fed. R. Civ. P. 37(c)(1).   As such, the Court will consider the substance of this evidence.

Turning next to the benefits purportedly conferred, USM LLC argues that BCI has not attributed a value to the services alleged provided to USM LLC.   BCI counters that "the contract demonstrates typical compensation for BCI's services in the financial industry" and, thus, "is probative of and a means of demonstrating the value of services provided to [USM LLC]."   (ECF No. 89 at 23.)   *See Constantino v. Am. S/T Achilles*, 580 F.2d 121, 122–23 (4th Cir. 1978) (holding "the contract price unquestionably is probative in ascertaining damages in Quantum meruit"); *United States v. Algernon Blair, Inc.*, 479 F.2d 638, 641 (4th Cir. 1973) ("the contract price may be evidence of reasonable value of the services," not the actual value of the performance).   USM LLC continues to take issue with the dollar amount recited in BCI's discovery response as being identical to the damages amount BCI claims for the alleged breach of the Engagement Letter. USM LLC maintains that because BCI's quantum meruit claim relates to services provided to USM LLC after its formation and after BCI performed all services under the Engagement Letter, the value of services performed under the Engagement Letter "cannot establish the value of any benefit that BCI conferred on USM LLC."   (ECF No. 79 at 37.)

The Court agrees with the general proposition that a plaintiff cannot claim both breach of contract and quantum meruit for identical services performed because "[a]n express contract and

an implied contract, relating to the same subject matter, cannot coexist." *Case v. Shepherd*, 84 S.E.2d 140, 144 (W. Va. 1954). Indeed, BCI may not recover under both breach of contract and quantum meruit for services performed under the Engagement Letter. However, USM LLC's argument misses the mark. BCI might be entitled to recover restitution under a quantum meruit claim, rather than a breach of contract claim, in the event the Engagement Letter does not cover BCI's services that resulted in the funding paid to USM LLC.[11] Given that a reasonable jury could find that those services do not trigger a fee obligation under the Engagement Letter, BCI may proceed on both claims for quantum meruit and breach of contract, though it may not recover under both. *See U.S. ex rel. Asphalt Contractors, & Site Work, Inc. v. KAR Contracting, LLC*, No. 3:14-cv-27451, 2015 WL 3651279, at *4 (S.D. W. Va. June 11, 2015). Accordingly, USM LLC's motion for summary judgment on BCI's quantum meruit claim is **DENIED**.

   *E. Fraud*

   In Count Four, BCI asserts a fraud claim predicated on Mr. Gunn's alleged promises on behalf of USM LLC to compensate BCI. According to BCI, Mr. Gunn induced BCI to continue providing services after USM LLC was formed. Relying on Mr. Gunn's representations that BCI would be compensated for its initial work under the Engagement Letter, BCI alleges that it continued to work for USM LLC but was never paid. (ECF No. 89 at 23–24.) The elements of a cause of action for fraud under West Virginia law are: "(1) that the act claimed to be fraudulent was the act of the defendant or induced by him; (2) that it was material and false [and] that plaintiff

---

[11] BCI alleges that it continued to work for USM LLC after it performed services for USM Corp. under the Engagement Letter and as reflected in its invoice to USM Corp. dated March 11, 2016. To the extent BCI seeks restitution for these additional services allegedly performed for USM LLC's benefit, the Court finds that BCI may not maintain such a quantum meruit claim because BCI has failed to identify what those services were or the value of those services.

relied on it and was justified under the circumstances in relying upon it; and (3) that he was damaged because he relied on it." *Bowens v. Allied Warehousing Servs., Inc.*, 729 S.E.2d 845, 852 (2012) (quoting Syl. Pt. 1, *Lengyel v. Lint*, 280 S.E.2d 66 (1981)).

The West Virginia Supreme Court has clarified that, "[a]ctionable fraud must ordinarily be predicated upon an intentional misrepresentation of a past or existing fact and not upon a misrepresentation as to a future occurrence." *Gaddy Eng'g Co. v. Bowles Rice McDavid Graff & Love, LLP*, 746 S.E.2d 568, 576 (W. Va. 2013) (citing *Croston v. Emax Oil Co.*, 464 S.E.2d 728, 732 (W. Va. 1995)). However, a fraud claim can be based "on statements which are promissory in nature or which constitute expressions of intention" if "the non-existence of the intention to fulfill the promise at the time it was made is shown." *Id.*

USM LLC argues that it is entitled to summary judgment on BCI's fraud claim because BCI has failed to put forth any evidence that USM LLC made the alleged promises to pay with the contemporaneous intent not to fulfill those promises. *See George Golf Design, Inc. v. Greenbrier Hotel Corp.*, No. 5:10-cv-01240, 2012 WL 4748802, at *3 (S.D. W. Va. Oct. 4, 2012) (at the summary judgment stage, a plaintiff "must point to sufficient evidence to support the existence of a genuine issue of material fact that [the defendant] made a promise with the contemporaneous intent not to fulfill it."). BCI counters that it was not possible for Mr. Gunn to fulfill his promises to pay BCI given his lack of actual authority to bind USM LLC without the Board's approval. Ms. Kohlmayer and Ms. Miller, both managers on the Board, testified that Mr. Gunn never sought approval from the Board to pay BCI. (ECF No. 89-6 at 6; ECF No. 89-14 at 3.) Thus, although Mr. Gunn had apparent authority as CEO to bind USM LLC, he took no action to obtain the necessary authorization to effectively do so.

25

Additionally, BCI points to emails between USM LLC's Board members that evidence an intent not to pay BCI.   On February 12, 2016, before BCI invoiced USM Corp., Ms. Miller stated to Mr. Gunn that she assumes the success fees owed to BCI under the Engagement Letter does not include KKCG equity because "[BCI] did not source the relationship."   (ECF No. 89-3 at 5–6.) Later, on September 6, 2017, Ms. Miller told Ms. Kohlmayer that, with regard to KKCG's $85 million investment, "We obviously won't pay [BCI] for that."   (*Id.* at 67.)   USM LLC contends that these statements are insufficient to establish a contemporaneous intent given the broad time period within which these statements were made.   However, Ms. Miller's statement to Mr. Gunn was made well before Mr. Gunn allegedly promised to pay BCI on behalf of USM LLC in May and August of 2016.   When coupled with the fact that Mr. Gunn never sought authority from the Board to make commitments on the part of USM LLC, the Court finds that this evidence creates a genuine issue of material fact regarding USM LLC's intent to execute its promises.

Apart from intent, USM LLC also argues that BCI's fraud claim essentially duplicates its breach of contract claim and, thus, is barred by the gist of the action doctrine.   The gist of the action doctrine is meant "to prevent the recasting of a contract claim as a tort claim."   *Gaddy*, 746 S.E.2d at 577.   It applies if any one of four factors is present:

> (1) where liability arises solely from the contractual relationship between the parties; (2) when the alleged duties breached were grounded in the contract itself; (3) where any liability stems from the contract; and (4) when the tort claim essentially duplicates the breach of contract claim or where the success of the tort claim is dependent on the success of the breach of contract claim.

*Id.* (quoting *Star v. Rosenthal*, 884 F. Supp. 2d 319, 328–29 (E.D. Pa. 2012)).   In *Gaddy*, the West Virginia Supreme Court of Appeals observed that "whether a tort claim can coexist with a contract claim is determined by examining whether the parties' obligations are defined by the terms of the

contract." *Id.*   In this case, BCI's fraud claim is based, not on the alleged contractual relationship between BCI and USM LLC or liability stemming from the Engagement Letter itself, but upon the alleged promises of future payment.   Thus, contrary to USM LLC's assertion, the gist of the action doctrine has no application here.   Summary judgment on BCI's fraud claim is **DENIED**.

*IV.    CONCLUSION*

For the foregoing reasons, USM LLC's Motion for Summary Judgment, (ECF No. 78), is **DENIED**.

**IT IS SO ORDERED**.

The Court **DIRECTS** the Clerk to send a copy of this Order to counsel of record and any unrepresented party.

ENTER:       May 28, 2020

THOMAS E. JOHNSTON, CHIEF JUDGE

27
